

FILED
2022 Jul-28  AM 10:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **TERRELL NORMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **2:20-cv-01765-KOB** |
| **DENIS RICHARD MCDONOUGH,** | ) | |
| ***Secretary, Department of Veterans*** | ) | |
| ***Affairs***, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Few areas of federal precedent are as well-settled as employment discrimination law. But nothing is set in stone, and Plaintiff Terrell Norman's case raises the recently-modified standard for causation in retaliation cases against federal employers. After wading into the new causation standard—whether discrimination "tainted" the challenged decision—the court finds a genuine issue as to whether Mr. Norman's evidence meets that standard. So the court will deny the Secretary's request for summary judgment.

Mr. Norman worked for the Veterans Affairs Hospital in Birmingham, Alabama, until the VA terminated him in January 2018. While he was still employed, Mr. Norman claimed that interactions with several coworkers constituted discrimination, hostile work environment, and retaliation in violation of

1

Title VII of the Civil Rights Act of 1968. *See* 42 U.S.C. §2000e *et seq*. After his firing, Mr. Norman also complained that the VA fired him in retaliation for complaining of the alleged sexual harassment he suffered in the workplace. The VA's Merit Systems Protection Board conducted an administrative hearing on those claims in July 2020, finding partially in Mr. Norman's favor and partially in the VA's favor. After the hearing, Mr. Norman settled all of his claims with the VA except the retaliatory discharge claim. He then filed that retaliation claim in this suit.

The VA Secretary has moved for summary judgment on Mr. Norman's sole claim for retaliatory discharge. (Doc. 23). That motion treads somewhat new ground because the Supreme Court recently modified the causation standard for retaliation claims against federal employers under the Age Discrimination in Employment Act. *See Babb v. Wilkie*, -- U.S. --, 140 S. Ct. 1168 (2020). In short order, the Eleventh Circuit extended that holding to retaliation claims against federal employers under Title VII as well. *See Babb v. Sec'y, Dep't of Veterans Affairs*, 992 F.3d 1193 (11th Cir. 2021). The key question for causation is now whether discrimination "tainted" the challenged decision: put differently, whether "discrimination plays any part in the way a decision is made." *Id.* at 1204. This new standard is "more lenient" to plaintiffs than the previous causation standard, which entailed the traditional *McDonnell Douglas* framework. *Id.* at 1198.

Mr. Norman responded to the Secretary's motion for summary judgment, (doc. 27), and the Secretary replied (doc. 30). For the reasons explained below, the court finds a reasonable jury could infer that retaliatory animus "tainted" the VA's decision to terminate him. So the court will deny the Secretary's motion.

## I.   STANDARD OF REVIEW

Courts may grant summary judgment to a movant who shows that no genuine issues of material fact exist and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).

Once the moving party meets its burden of showing that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). And the non-moving party must "go beyond the pleadings and by

[its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

The court must "view the evidence presented through the prism of the substantive evidentiary burden" to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). The court must refrain from weighing the evidence and making credibility determinations because these decisions fall to the province of the jury. *Id.* at 255. Furthermore, the court must view all evidence and reasonable inferences drawn from the underlying facts in the light most favorable to the non-moving party. *See Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).

## II.   FACTS

### A. Background

Mr. Norman began working for the Birmingham VA Hospital in March 2009. Beginning in 2013, Mr. Norman assumed the role of lead medical supply technician. Lead medical supply technicians work in a sterilization center at the hospital, cleaning instruments to be reused in medical procedures throughout the facility.

In the relevant time period, Mr. Norman had two supervisors: Reuben

4

Fowlkes and Cassandra Richardson. Richardson was "Chief" of the sterilization center. In a similar supervisor role, Brian Reynolds also served as "Assistant Chief" of the sterilization center.[1] Stephanie Hendrix,[2] the Chief Nurse for Surgery and the sterilization center, was over Mr. Norman's supervisors. At the top of the command chain, Thomas Smith served as the director of the Birmingham VA. Hendrix recommended Mr. Norman's termination in November 2017, and Smith made the final decision to terminate him in January 2018.

## B. <u>Prior Discrimination Allegations</u>

In April 2017, Mr. Norman's coworkers made several sexually lewd comments to him that he believed constituted sexual harassment. Those comments have little relevance to this suit because Mr. Norman states no claims concerning them. But Mr. Norman complained of those comments to Reuben Fowlkes on April 20, 2017, and again to Stephanie Hendrix on May 4, 2017. Shortly thereafter,[3] Assistant Chief Reynolds conducted a team meeting in which he insinuated that opening "Pandora's Box" by complaining of discrimination could trigger other coworkers to share negative things about the complainant. (Doc. 22-5 at 18; *id*. at 21). Mr. Norman was present for that meeting and took the Pandora's box comment as directed at him.

---

[1] Based on the filings, the court finds it difficult to discern the chain of command among Mr. Norman's supervisors.

[2] Certain portions of the record refer to Ms. Hendrix as Stephanie *Hendricks*. (Doc. 22-5 at 28).

[3] The parties do not state when Reynolds conducted the team meeting, but they agree it occurred before Richardson issued written counselings on May 26, 2017.

After hearing of Mr. Norman's complaint and the meeting led by Reynolds, the Department Chief Tommy Richardson issued "written counselings" to *all employees* in the department, including Mr. Norman, on May 26, 2017. (Doc. 22-5 at 4). Written counselings are a form of written correction for misbehavior. Notably, Reuben Fowlkes received a written counseling as part of that disciplinary action, and he later testified that he "disagreed with that write-up." (Doc. 22-5 at 11). All employees in the sterilization department then received sexual harassment training on June 7. (Doc. 22-5 at 24).

As explained below, Mr. Norman filed EEO charges on August 18, 2017, concerning the alleged comments from co-workers, as well as Reynolds' "Pandora's box" comment and the written counselings, which he alleged were retaliatory. (Doc. 22-4 at 2). That conduct is not at issue in this case.

### C. "Reports of Contact" Preceding Mr. Norman's Termination

From the beginning of his employment in 2009 until May 2017, Mr. Norman never received any form of discipline for any kind of conduct or performance issues. (Doc. 27 at 6). But beginning in June 2017, after his reports of harassment in April and May, Mr. Norman's supervisors filed several "reports of contact" (ROCs), detailing his alleged failure to follow workplace conduct standards. Supervisors file ROCs in employees' personnel files to document alleged misconduct, but supervisors do not discuss the allegations with employees. The

Secretary now argues that these ROCs form the legitimate, non-discriminatory

reason for Mr. Norman's termination in January 2018. Mr. Norman disputes the

truth of the allegations in the ROCs, as explained below.

The first ROCs occurred in June 2017:

- On June 19, Reuben Fowlkes filed a ROC about an incident between Mr.
  Norman and a co-worker, Micah Sutherland. (Doc. 22-13). The ROC describes
  a verbal altercation between Sutherland and Mr. Norman. Sutherland reported
  the altercation to Fowlkes, who allegedly met with Sutherland and Norman.
  Fowlkes sent the workers back to their stations after verbal correction. But Mr.
  Norman testified at the administrative hearing that the meeting with Fowlkes
  about this alleged incident never occurred. (Doc. 22-5 at 36).

- On June 26, Fowlkes filed another ROC, alleging that Mr. Norman was joking
  with coworkers about the poor job performance of a fellow worker in the
  sanitation center. (Doc. 22-14). Fowlkes came over to resolve the dispute, but
  Mr. Norman allegedly left the area and went to Chief Richardson to complain
  of the incident. Mr. Norman testified that these events never occurred; instead,
  he followed Fowlkes's prior advice to keep his interactions with coworkers
  "professional." (Doc. 22-5 at 36; doc. 22-1 at 24).

On June 27, 2017, Assistant Chief Reynolds issued a memorandum

reassigning Mr. Norman from the evening shift to the day shift. Both Reynolds and

Richardson testified that the VA's human resources department advised them to

reassign Mr. Norman after investigating the alleged events on June 19 and June 26

and finding that Mr. Norman was the "aggressor." (Doc. 22-5 at 18; *id.* at 24).

Although the reassignment memo stated that Mr. Norman's pay would remain

unchanged, he could no longer earn the pay incentive available to employees that

worked the night shift. (Doc. 22-5 at 11). On the night shift, Mr. Norman's

supervisor had been Reuben Fowlkes; on the day shift, his supervisor was Cassandra Richardson.

Mr. Norman disputes whether he continued to serve in his prior role of *lead* medical supply technician after his reassignment, or whether the reassignment included a demotion to the role of medical supply technician. For example, a November 2017 performance appraisal for Mr. Norman lists his role as "medical supply technician." (Doc. 22-4 at 5). But Reynolds, Richardson, and Fowlkes all testified that Mr. Norman continued "acting in a role of a lead tech," even after the reassignment. *E.g.*, (doc. 22-5 at 24). Mr. Fowlkes testified that "because [Norman was] moved to another shift does not relieve [him] of [his] responsibilities as a lead tech." (*Id.* at 14). But Mr. Norman responds that he was not a lead tech because another lead tech already served on the day shift to which Mr. Norman was reassigned. (Doc. 22-5 at 14).

On June 27—the same day Reynolds reassigned him— Mr. Norman contacted the VA's Equal Employment Opportunity counselor about possible discrimination claims, but he did not file claims or charges at that time.

Mr. Norman's supervisors then filed three ROCs against Norman in July 2017:

- On July 12, Assistant Chief Reynolds filed a ROC alleging that Mr. Norman violated personal protective equipment (PPE) protocol in two ways: he failed to wear a beard cover, and his scrub pants "were almost about to hit the floor." (Doc. 22-15). The ROC states that Reynolds confronted Mr. Norman about

these issues, and Mr. Norman responded, "I know." (*Id.*). But Mr. Norman testified that the sterilization center lacked adequate beard covers and scrub pants on that day; so he wore a makeshift beard cover and pants that, despite being one size too large, fit properly. (Doc. 22-1 at 23). In response, Reynolds testified that he and Mr. Norman wore the same size scrub pants and beard cover, and that the sterilization center provided him with proper PPE on that day. (Doc. 22-5 at 19).

- On July 13 Reynolds filed another ROC, stating that Mr. Norman wore improper shoe coverings in the sterilization center. (Doc. 22-16). Norman did not recall this event taking place, and he stated that no one confronted him about it until his firing. (Doc. 22-1 at 22).

- On July 14—the next day—Reuben Fowlkes filed a ROC, alleging that Mr. Norman failed to clean a medical drill in the area that he was assigned to work for the day. (Doc. 22-17). The ROC states that the drill still had "a large quantity of bloody fluid" that got on Fowlkes's hand. Fowlkes did not observe Mr. Norman's failure to clean the item. (Doc. 22-5 at 5). In his deposition, Mr. Norman responded that he had "no knowledge of that incident occurring." (Doc. 22-1 at 20). And he noted that he never received a verbal or written "counseling" based on the alleged incident, which would have been serious enough to merit such action. (*Id.*).

On August 16, 2017, Chief Richardson issued a "justification memorandum" seeking Mr. Norman's demotion based on "a pattern of adverse conduct with staff as noted in actions." (Doc. 22-18). Chief Richardson was aware of Mr. Norman's complaints about the allegedly sexually harassing comments from coworkers in April 2017, (doc. 22-5 at 17); but the justification memorandum cites only Mr. Norman's alleged failure to comply with PPE guidelines in July 2017 and other "below average work performance." (Doc. 22-18 at 2). The VA took no action on Richardson's memorandum.

On August 18, 2017, Mr. Norman filed a complaint of discrimination with

the VA's EEO counselor, stating claims of sexual harassment, racial discrimination, and retaliation. (Doc. 22-4 at 2). The complaint identified the roles of Reuben Fowlkes, Cassandra Richardson, and Brian Reynolds in allegedly failing to remedy the harassment and instead disciplining Mr. Norman. (Doc. 22-4 at 3). Mr. Norman did not tell anyone besides his lawyer about his contact with the EEO or his EEO complaint. But Chief Nurse Hendrix testified that she learned of Mr. Norman's EEO complaint before ultimately recommending his termination on December 18, 2017. (Doc. 22-5 at 29).[4]

The record remains silent for several weeks until October 2017, when Reuben Fowlkes issued three more ROCs against Mr. Norman:

- On October 18, Fowlkes filed a ROC, alleging that Mr. Norman failed to clean several large cases of soiled medical items, while cleaning only smaller cases during his shift. (Doc. 22-20). The ROC states that Chief Richardson confronted Mr. Norman about the failure to clean, and "no correction was made." (Doc. 22-20). Mr. Norman disputes that this incident occurred because VA protocol required him to check in with Chief Richardson, who would conduct a walk-through to ensure he completed his tasks before leaving his work station each day. (Doc. 22-5 at 32). And Richardson approved him to leave on that day. (Doc. 22-5 at 32).

- On October 19, Fowlkes filed a second ROC, alleging that Mr. Norman left his station over three hours early. (Doc. 22-21). Mr. Norman allegedly left several soiled trays and instruments uncleaned, as well as failed to document over forty pages of biological results. (Doc. 22-21). Mr. Norman responds that Fowlkes conducted a walk-through with Mr. Norman before he left that day and approved him to leave. (Doc. 22-1 at 18). Fowlkes responded that no such walk-through occurred, and that he relied on Mr. Norman's word in explaining

---

[4] The court notes its curiosity about the specifics of the parties' previous EEO proceedings, including how Chief Nurse Hendrix learned of his EEO activity and who else knew about the EEO proceedings and when. But the record provides little information on those points.

that he had completed all tasks for the day. (Doc. 22-5 at 28).

- On October 23, Fowlkes filed a third ROC, alleging that Mr. Norman failed to record the temperature in the sanitation center for an entire week—a safety measure that was allegedly part of Mr. Norman's normal duties. (Doc. 22-19; doc. 22-5 at 7). In response, Mr. Norman testified that only the *lead* technician bore the duty of recording temperatures, and that he was not the lead technician on the day shift. (Doc. 22-1 at 20). But Fowlkes testified that Mr. Norman operated as a lead tech at that time, and at any rate, "anyone entering into the decon[tamination] areas" should have recorded temperatures. (Doc. 22-5 at 7).

Although Reuben Fowlkes supervised Mr. Norman on the night shift, he admitted that, during October 2017, he did not work the day shift with Mr. Norman. (Doc. 22-5 at 10). The parties do not explain why Fowlkes continued to file ROCs against Mr. Norman after his reassignment to the day shift on June 27. And Fowlkes admitted that he was not present "on most occasions" that Mr. Norman worked the day shift. (Doc. 22-5 at 10–11). But at least as to the October 19 incident, Fowlkes testified that he was present at the end of Norman's shift. (Doc. 22-5 at 28).

### D. <u>Positive Performance Appraisal</u>

Despite the numerous ROCs filed in Mr. Norman's personnel file, his supervisors never initiated formal disciplinary proceedings against him. (Doc. 22-5 at 29). In fact, the VA issued Mr. Norman a positive "performance appraisal" evaluation in November 2017—less than two months before his firing. (Doc. 22-4 at 5). That evaluation marked Mr. Norman's performance "at the fully successful level" for all categories, including cleaning, adhering to guidelines, and

interpersonal behaviors. The period for that evaluation was October 1, 2016 to September 30, 2017; so that period *included* the time period of the ROCs against Mr. Norman in June and July of 2017 but *excluded* the three ROCs from October 2017. Notably, the evaluation does not mention any ROCs or disciplinary intervention.

### E.  Norman's Termination and EEO Activity

On December 18, 2017 Chief Nurse Hendrix proposed Mr. Norman's termination. The proposal cited charges including failure to follow supervisory instruction, careless performance of duties, failure to complete assignments, failure to follow work attire and personal protective equipment, and inappropriate conduct. (Doc. 22-5 at 28). These charges correspond to the ROCs from June 2017 through October 2017. Hendrix testified that she proposed Mr. Norman's termination based on the ROCs against him. (*Id.* at 30). The proposal memo specifically recounts the events from June, July, and October described above. (Doc. 22-3 at 45). She admitted that she relied on the ROCs rather than her own knowledge because Mr. Norman's supervisors were "in the work area making assessments and doing the staff evaluations." (Doc. 22-5 at 30). And as explained, Hendrix knew about Mr. Norman's complaints about sexual harassment in April 2017 and his EEO complaint in August 2017 before she filed the termination proposal. (Doc. 22-5 at 29).

On January 29, 2018, the VA Hospital's director, Thomas Smith, terminated Mr. Norman's employment. (Doc. 22-11). Smith stated he consulted Mr. Norman's "supervisory chain" and the ROCs to understand the charges against him; he based his termination decision on "the number of offences and the severity." (*Id.* at 3). He also permitted Mr. Norman to provide a written response to the proposal, and considered that response. (*Id.*). The parties do not indicate whether Director Smith knew about Mr. Norman's EEO activity or his positive performance appraisal in November 2017.

Meanwhile, Mr. Norman's EEO complaint from August 2017 concerning sexual and racial harassment remained pending. In April 2018, Mr. Norman filed a second EEO complaint, alleging that he was terminated in retaliation for complaining of sexual harassment in April and May 2017, for meeting with the EEO counselor in June 2017, and for filing his EEO complaint in August 2017. (Doc. 22-4 at 1).

The VA's Merit Systems Protection Board consolidated Mr. Norman's two EEO complaints and held a hearing on July 7, 2020. (Doc. 22-5). After the hearing, the administrative law judge produced an opinion of nearly 50 pages, making the following findings:

- The comments of Mr. Norman's coworkers in April 2017 constituted sexual harassment;

- Assistant Chief Reynolds's "Pandora's box" comment and Department Chief

Richardson's written counseling in May 2017 constituted retaliation for reporting the sexual harassment;

- Mr. Norman *did not* suffer discrimination or retaliation as to the other events;

- And Mr. Norman's termination *did not* constitute retaliation.

After the Board's ruling, Mr. Norman unsuccessfully appealed the retaliatory termination claim. He settled all other claims with the Secretary. He then filed this case concerning his retaliatory termination.

### III.   <u>ANALYSIS</u>

Mr. Norman claims that the VA terminated him in retaliation for reporting alleged sexual and racial discrimination to his supervisors in April and May 2017, for reaching out to the EEO counselor in June 2017, and for filing the EEO charge about those claims in August 2017, in violation of Title VII's public employer provisions. *See* 42 U.S.C. § 2000e16-(a).

A plaintiff states a *prima facie* case of retaliation under Title VII by showing: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *See Malone v. U.S. Att'y Gen.*, 858 F. App'x 296, 303 (11th Cir. 2021) (citation omitted).

Here, the Secretary does not dispute that Mr. Norman engaged in statutorily protected activity or that his termination constituted an adverse action. (Doc. 23 at 28). Even so, the court finds that the Secretary takes an overly narrow view of Mr.

14

Norman's "protected conduct"; so it will address that issue first. The court will then turn to Mr. Norman's evidence of a causal link between his protected activity and his firing. And the court will discuss the recent change in case law concerning that issue.

### A.     Mr. Norman's Protected Conduct

The Secretary assumes—without argument—that Mr. Norman's *only* protected conduct was his meeting with an EEO counselor on June 29, 2017, and his filing the first EEO complaint on August 16, 2017. (Doc. 23 at 29). As such, the Secretary challenges whether Mr. Norman establishes a causal link between his firing and those two actions, only.

But "Title VII protects not just individuals who have filed formal complaints, but also those who informally voice complaints to their superiors or who use their employers' internal grievance procedures." *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (quotation omitted).[5]

Here, Mr. Norman argues that he also engaged in protected conduct when he complained of sexual harassment in April and May 2017. Indeed, his complaint alleges that he engaged in protected activity when he reported the harassment to his supervisors, when he reached out to the EEO counselor, and when he filed his EEO complaint. (Doc. 1 at 2). The Secretary admits that these events occurred. Those

---

[5] *Babb*'s new causation standard, discussed below, "did not affect" the definition of adverse actions. *See Tonkyro v. Sec'y, Dep't of Veterans Affairs*, 995 F.3d 828, 832 n.1 (11th Cir. 2021).

events also constitute protected activity because Mr. Norman "informally voice[d]

complaints to [his] superiors." *See Shannon*, 292 F.3d at 715 n.2.

So the court finds that Mr. Norman engaged in protected activity on at least

four occasions:

1. When he reported alleged sexual harassment to Reuben Fowlkes on April 20, 2017;

2. When he reported alleged harassment to Chief Nurse Stephanie Hendrix on May 4;

3. When he contacted the EEO counselor on June 29; and

4. When he filed his first EEO complaint on August 18.

The court is aware that Mr. Norman already settled his claims concerning

the alleged harassment that occurred in April and May of 2017. But his *reporting*

those incidents to Fowlkes and Hendrix still constitutes protected activity for

purposes of his retaliatory discharge claim. So the court now turns to whether Mr.

Norman sufficiently offers proof of a causal link between the VA's decision to

terminate him and his protected conduct of reporting harassment in April and May

2017 and filing his EEO complaint in August 2017.

## B. <u>The Causation Standard for Public-Employer Retaliation Claims</u>

Title VII law previously required plaintiffs to prove that their employer

would not have fired them, but-for their protected activity. *See, e.g.*, *Univ. of Tex.

Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346 (2013). The but-for causation standard

employed the traditional burden-shifting framework set forth under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny.

But the Supreme Court recently modified the causation standard for retaliation claims against public employers. In *Babb v. Wilkie*, 140 S. Ct. 1168 (2020), the Supreme Court addressed a plaintiff's retaliation claim under the ADEA. The Court found that the statutory language of the ADEA—that employment decisions must be "free from any discrimination based on age"— entailed a causation analysis focused on whether the challenged decision was "tainted by differential treatment based on age." *Id.* at 1174. The Eleventh Circuit quickly applied that finding to claims against public employers under Title VII as well because the causation language in Title VII's public-employer provision matches that of the ADEA. *See Babb v. Sec'y, Dep't of Veterans Affairs*, 992 F.3d 1193, 1200 (11th Cir. 2021).

The Eleventh Circuit then explained the significance of the new "tainted" causation standard by reiterating the Supreme Court's language:

> If at the time when the decision is actually made, age *plays a part*, then the decision is not made "free from" age discrimination. Indeed, the Court expressly clarified that "age must be the but-for cause of *differential treatment*, not that age must be a but-for cause of *the ultimate decision*."

*Babb*, 992 F.3d at 1204 (quoting *Babb*, 140 S. Ct. at 1174) (emphasis in original).

The Eleventh Circuit instructed lower courts to simply "replace 'age' with Title

VII's set of protected characteristics . . . plug and chug." *Babb*, 992 F.3d at 1202.

In contrast to the traditional *McDonnell Douglas* causation standard, the Circuit Court explained, "even when there are non-pretextual reasons for an adverse employment decision—as the government says there are here—the presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations." *Id.* at 1204. The Eleventh Circuit described this causation standard as "more lenient" than the *McDonnell Douglas* standard because it amounts to a "purity requirement," *id.* at 1198–99; i.e., the employment decision must be "free from" any taint of discrimination.

Few Eleventh Circuit cases exist under this new causation standard. In one case, the Eleventh Circuit found no causation because the plaintiff provided *no* proof of causation, while admitting that he merely "speculated" that his protected conduct caused his employer's adverse decision. *Durr v. Sec'y, Dep't of Veterans Affairs*, -- F. 4th --, 2022 WL 2315086, *3 (11th Cir. 2022).

But the lower courts have noted that "a plaintiff's burden under the *Babb* standard appears light." *Ford v. DeJoy*, No. 4:20-cv-00778-NAD, 2021 WL 6113657, *9 (N.D. Ala. Dec. 27, 2021) (Danella, M.J.). In *Ford*, the court found that sex discrimination "tainted" a female supervisor's suggestion to adversely reassign the male plaintiff as part of an office-wide restructuring. *Id.* at *9. The court analyzed traditional indications of discrimination—whether the female

supervisor reassigned any similarly situated female comparators (she had not) and whether her stated justification for the reassignment had merit (it had some, but not much). *Id.* at *8.

Admittedly, the *Ford* court's choice to consider comparators and the employer's justifications closely resembles the former *McDonnell Douglas* framework. And "because the *McDonnell Douglas* framework and the 'convincing mosaic' test are methods used to show that a protected characteristic was the but-for cause of the ultimate decision . . . they no longer apply to cases brought under the federal-sector provision of Title VII." *Durr*, 2022 WL 3215086, *1 (quotation omitted). Even so, this court, like the *Ford* court, finds the traditional causation analysis helpful because, if the plaintiff meets that standard, then he certainly meets the "more lenient" *Babb* standard. So below, the court addresses traditional markers for causation, including the temporal proximity between adverse acts and protected conduct and the pretextual justifications for Mr. Norman's termination.

Finally, the parties agree that the *Babb* standard governs causation for Mr. Norman's Title VII retaliation claim. (Doc. 23 at 26; doc. 27 at 10). But even if they did not, the court finds it appropriate to apply that standard because "generally, new rules of law are applied retroactively as well as prospectively" to cases pending when the new rule is announced. *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 544 (11th Cir. 2002) (citation omitted).

## C.      Causation for Mr. Norman's Retaliation Claim

Mr. Norman shows a genuine dispute as to whether retaliatory animus tainted his termination for two reasons. First, Mr. Norman's supervisors made informal disciplinary statements or issued ROCs in close temporal proximity to each of Mr. Norman's statutorily-protected acts. And second, Reuben Fowlkes's testimony and Mr. Norman's "fully successful" performance evaluation cast serious doubts on the veracity of the ROCs that allegedly justified his termination.

### i. Close Temporal Proximity

As explained above, Mr. Norman engaged in statutorily protected conduct on April 20, May 4, June 29, and August 18, 2017, and he had received no ROCs or disciplinary action before that time. The court finds that Mr. Norman's supervisors' disciplinary actions against him shortly after each of his protected acts—disciplinary actions that were the basis for his termination—indicate that retaliation also tainted the decision to fire him in January 2018.

In the Eleventh Circuit, "mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action" can sufficiently prove causation. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Without more, that proximity must be "very close": the Eleventh Circuit has found that one month between protected activity and adverse action supports causation, *see Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986),

but it has found that three months' delay, "*in the absence of any other evidence of causation*," does not suffice. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (emphasis added).

Here, the Secretary argues that Mr. Norman's termination in January 2018 lacked temporal proximity to his final protected act of filing his EEO complaint in August 2017, nearly five months earlier. (Doc. 23 at 29). If all Mr. Norman relied on was temporal proximity, the Secretary would have a good point. But that argument fails to account for the numerous adverse events that occurred within weeks after *each* of Mr. Norman's protected acts, some of which were used as reasons for his termination:

- Mr. Norman complained of sexual harassment on April 20 and May 4, 2017; shortly thereafter Reynolds cautioned all employees in the sterilization center about "opening Pandora's box" with such complaints. The administrative law judge later found this statement to constitute retaliation against Mr. Norman for his complaints.

- On May 26, 2017—three weeks after Mr. Norman's sexual harassment complaint—Chief Richardson issued written counselings about alleged sexual harassment to Mr. Norman and all employees in the sterilization center, including Fowlkes and presumably Reynolds. The administrative law judge also found this act to constitute retaliation.

- Between June 24 and July 14, Fowlkes and Reynolds filed four ROCs against Mr. Norman for inappropriate conduct with coworkers, failure to clean items, and alleged PPE violations. These ROCs occurred less than a month after Mr. Norman contacted the EEO counselor on June 29, and roughly two months after he reported alleged harassment. Both Fowlkes and Reynolds knew about Mr. Norman's reports. (Doc. 22-5 at 17; *id.* at 11).

- On August 16, 2017, Chief Richardson issued the justification memo proposing

Mr. Norman's demotion less than two months after Norman contacted the EEO counselor on June 29. The parties provide no evidence of whether Richardson knew about Mr. Norman's EEO complaint as of August 2017; but she knew about his harassment reports made in April and May 2017. (Doc. 22-5 at 11).

- Between October 16 and 22, Fowlkes filed three ROCs against Mr. Norman for his alleged failure to clean items and record temperatures. These ROCs occurred roughly two months after Mr. Norman filed his first EEO complaint on August 18.

- Hendrix proposed Mr. Norman's removal on December 18, 2017, exactly four months after he filed his EEO complaint. She knew he had filed an EEO complaint before issuing the termination proposal. (Doc. 22-5 at 29).

In other words, Mr. Norman does not rely merely on the temporal proximity of a single adverse action to prove causation. The Eleventh Circuit has found a three-month temporal proximity insufficient to prove causation, "*in the absence of any other evidence of causation*." *Drago*, 453 F.3d at 1308 (emphasis added). But Chief Nurse Hendrix's firing recommendation on December 21, 2017, was part of a *series* of adverse actions that a reasonable jury could find was motivated by retaliatory animus and calculated to lead to his termination. That series of disciplinary actions—the first disciplinary write-ups in Mr. Norman's eight-year employment history—began after he reported harassment in April and May of 2017 and continued for another six months until his firing in January 2018. So the court finds it too reductionistic to analyze *only* the temporal proximity between Mr. Norman's EEO complaint in August 2017 and his firing in January 2018.

Rather, the court views Mr. Norman's firing as the culmination of a series of

adverse actions beginning in May 2017 in response to his report of harassment, through August 2017 in response to his EEO complaint, continuing in October 2017 with the filing of three dubious ROCs, discussed below, and ending in his firing in reliance on the ROCs and disciplinary actions. Each of these adverse acts forms a link in a chain with breaks no greater than two months between them, and they set in motion the events that led to the decision to terminate Mr. Norman.

Further, Mr. Norman raises a genuine dispute as to the credibility of Fowlkes, Reynolds, and Richardson, who issued those disciplinary actions. The court will later explain its concern that Fowlkes and Reynolds acted with retaliatory motives because of the written counselings they received.[6] And Mr. Norman's EEO complaint accused all three of those individuals of wrongdoing. (Doc. 22-4 at 3). A reasonable jury could infer that Mr. Norman's filing an EEO complaint against those supervisors resulted in their successful efforts to retaliate against him. So the court finds the Eleventh Circuit's three month "cutoff," as set forth in *Drago*, inapplicable to a case such as this, with its six-month chain of interrelated adverse acts, all of which followed Mr. Norman's separate act of protected conduct and ultimately led to his termination.

---

[6] The record does not indicate whether Richardson also issued a written counseling to Reynolds because of Mr. Norman's harassment allegations; but Reynolds worked in the sterilization center, and all employees of the center received written counselings. (Doc. 22-5 at 4). So a jury could reasonably infer that Reynolds also received a written counseling. *See Graham*, 193 F.3d at 1282 ("The evidence of non-movants is to be believed and all justifiable inferences are to be drawn in his favor.").

Two additional points support viewing the adverse actions as a continuous series with temporal proximity to Mr. Norman's protected conduct, rather than in isolation. First, Chief Nurse Hendrix testified that her termination recommendation rested primarily on the collective weight of the ROCs, about which she consulted Fowlkes and Richardson, Mr. Norman's supervisors. (Doc. 22-5 at 30). And she admitted she had no independent knowledge on which she based her firing recommendation. (*Id.*). Likewise, Director Smith stated that his firing decision rested primarily on the proposal from Hendrix and the "the number of offences and the severity" of the ROCs against Mr. Norman. (Doc. 22-11 at 3). In other words, the ROCs stretching back to June 2017 set in motion Mr. Norman's firing about six months later. And the supervisors who issued those ROCs both played a part in handling Mr. Norman's harassment complaints in April and May 2017 and were identified in Mr. Norman's EEO complaint in August 2017.[7] So a reasonable jury could find that the temporal proximity of the disciplinary actions by those supervisors indicates retaliatory animus in Mr. Norman's later firing.

And second, the *Babb* standard addresses whether retaliation was "the but-for cause of *differential treatment*, not [whether retaliation was] a but-for cause of

---

[7] Although Mr. Norman does not raise the "cat's paw" theory of causation, the court finds analogy to it here because Director Smith's firing decision relied almost exclusively on the disciplinary actions filed by Fowlkes, Reynolds, and Richardson, whose motives Mr. Norman's evidence genuinely disputes. *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) ("[The cat's paw] theory provides that causation may be established if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee.").

*the ultimate decision.*" *Babb*, 140 S. Ct. at 1174. So although Mr. Norman only

seeks recovery for the VA's firing decision (i.e., the "ultimate decision"), the court

finds it appropriate to view that decision in the larger context of the "differential

treatment" he suffered, including the adverse supervisor interactions and ROCs

that began in May 2017 after he reported harassment, and which culminated in his

firing.

The Secretary's only response to the six-month series of disciplinary actions

is that the ones occurring before Mr. Norman's EEO visit on June 29, 2017,

"predate Plaintiff's statutorily protected activity." (Doc. 30 at 6). As explained, the

Secretary misconstrues Mr. Norman's protected activity by overlooking Mr.

Norman's complaints in April and May 2017. Almost immediately after that, his

supervisors launched a steady stream of disciplinary actions with breaks no greater

than two months between them. And even if the court looks only to Mr. Norman's

contact with the EEO, as the Secretary urges, his supervisors filed numerous ROCs

and disciplinary actions in August and October 2017, shortly after Mr. Norman

asserted complaints against them in his EEO complaint.

In sum, the court finds that the string of disciplinary actions by Mr.

Norman's supervisors, each taken shortly after his protected actions, does not

reflect "purity" in his supervisors' motives for their disparate treatment. *See Babb*,

992 F.3d at 1199. The volume of the disciplinary actions, their temporal proximity

to his protected conduct, and the motives of the supervisors who initiated them create a genuine dispute as to whether retaliatory animus motivated Mr. Norman's supervisors to request his termination. So the court finds a reasonable jury could infer that retaliation "tainted" Mr. Norman's termination. *See id.* at 1204.

### ii. Reasonable Doubts as to the ROCs

The Secretary argues that the ROCs filed against Mr. Norman justified the VA's decision to terminate him. (Doc. 30 at 8). But the court also finds a genuine dispute as to the veracity of the ROCs based on the evidence concerning the underlying incidents.

Initially, two facts raise concerns about the ROCs: (1) Mr. Norman never received any ROCs or disciplinary actions in the eight years of his employment before his complaints of harassment in April 2017, and then he suffered eleven disciplinary actions in ten months; and (2) his performance review in November 2017 made no mention of the first four ROCs and gave him a "fully successful" rating.

Additional concerns arise when the court examines the ROCs in greater detail. Mr. Norman received four ROCs in June and July of 2017 concerning his alleged failure to wear any beard cover or properly fitting pants (July 12); Mr. Norman's alleged failure to wear proper shoe coverings (July 13); Mr. Norman's alleged failure to clean soiled trays and a bloody drill (July 14); and his misconduct

with another employee (June 24).

Mr. Norman's testimony creates a genuine dispute concerning the validity of the June and July ROCs. As to the beard cover incident, Mr. Norman admitted that he was not wearing the *proper* beard cover, but he explained that he did so only because the sterilization center failed to provide beard covers on that day. (Doc. 22-1 at 23). Instead, he wore a surgical mask that he knew did not fulfill PPE requirements, but that was the best alternative he could locate. He also testified that, upon learning of the lack of beard covers, he reached out to "the logistics area" team to ask for more; he learned that the facility had no additional beard covers in stock. (Doc. 22-1 at 23). Mr. Norman's testimony disputes the ROC stating that Mr. Norman wore *no* beard cover at all.

In response, the Secretary puts forth the testimony of Assistant Chief Reynolds, who wrote the ROC concerning the beard cover. Reynolds testified that this incident occurred on July 12, during a departmental inspection of the sterilization center. (Doc. 22-5 at 19). As such, he stated that the center had ensured it had adequate PPE for all employees. He also stated that he typically wore a beard cover no different than Mr. Norman was required to wear, and that he wore such a cover on July 12. (Doc. 22-5 at 19). And he stated that the inspectors noticed Mr. Norman's beard cover violation as well. But the Secretary provides no testimony from those inspectors, and Mr. Norman disputed whether he and

Reynolds worked in the same area on that day at all. (Doc. 22-5 at 33).

The Secretary urges the court to disregard Mr. Norman's testimony because the record "blatantly contradict[s]" it. (Doc. 30 at 8). But as support, the Secretary relies on *Scott v. Harris*, 550 U.S. 372, 380 (2007), a case in which the plaintiff's testimony about his allegedly dangerous driving contradicted *video surveillance footage* of his driving during the incident at issue. *Id.* Here, the Secretary provides no such irrefutable evidence. Instead, Reynolds and Norman's conflicting testimony "presents a classic swearing match, which is the stuff of which jury trials are made." *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013). And Mr. Norman's testimony about the makeshift beard cover and his efforts to locate a proper cover casts far more than a "metaphysical doubt" on the validity of the ROC. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586. So the court will not disregard Mr. Norman's testimony, and the court instead finds a genuine dispute as to whether Reynolds had a valid basis for filing the ROC concerning the beard cover on July 12.

For much the same reason, the court finds genuine issues as to the validity of the other ROCs in July 2017. As to his scrub pants, Mr. Norman testified that the sterilization center failed to provide the proper size of scrub pants; so he wore one size too large. (Doc. 22-1 at 23–24). But Mr. Norman recalled that Reynolds questioned him about the pants, that Norman re-checked that his pants fit properly,

and that they did so. (*Id.* at 23). As to the foot coverings, Mr. Norman denied that the incident occurred. (Doc. 22-5 at 36). As to the bloody drill and trays, Mr. Norman testified that he did not recall that event occurring. (Doc. 22-1 at 19). He also noted that such a gross oversight should, under sterilization center policy, trigger his supervisor to "re-educate" him about cleaning or, at the least, bring it to his attention. (Doc. 22-1 at 19). But he testified that no one discussed that incident with him until his firing, six months later. (Doc. 22-1 at 19).

In response, Mr. Norman's supervisors—Reynolds, Fowlkes, and Richardson—testified that each of those July 2017 incidents occurred just as the ROCs describe. But in his EEO complaint, Mr. Norman claimed that each of those individuals played a role in improperly addressing his sexual harassment reports. A reasonable jury could find that retaliation for that EEO complaint motivated Reynolds, Fowlkes, and Richardson in creating the ROCs and testifying to their accuracy. And Mr. Norman's contrary testimony presents a question of credibility, which the court may not resolve on a motion for summary judgment. *See Graham*, 193 F.3d at 1282. Instead, the court must view this evidence in the light most favorable to Mr. Norman. In that light, the court finds a genuine dispute as to whether Mr. Norman's supervisors had any valid basis for filing the ROCs in June and July 2017—ROCs that Chief Nurse Hendrix and Director Smith admitted formed the basis for their termination decision.

Add to this evidence that Mr. Norman's supervisors issued a positive performance evaluation in November 2017 that covered the time including these incidents in June and July 2017. That appraisal marked Mr. Norman as "fully successful" in all categories of the job, including cleaning tasks, complying with safety regulations, and interpersonal behavior. (Doc. 22-4 at 5). And Chief Richardson wrote in the comments section: "Mr. Norman is a resource for instruments, trays, and procedures in the sterile processing department. He follows up with other departments and staff to make sure the sterile processing has met their needs." (*Id.* at 8). Fowlkes testified that his own reports of Mr. Norman's conduct contributed to Richardson's positive evaluation and that her comments were accurate. (Doc. 22-5 at 10). The evaluation contains *no* mention of the ROCs from June and July of 2017 or the events alleged in them. This positive performance evaluation and its silence about the alleged events of June and July 2017 cast further doubt on the veracity of the ROCs that supported Mr. Norman's firing.

Even so, the Secretary would shift the court's focus to the three ROCs from October 2017—which occurred two months after Mr. Norman filed his EEO complaint. The Secretary argues that those ROCs provide sufficient, non-discriminatory support for Mr. Norman's firing. (Doc. 23 at 31). The court disagrees. For one thing, the Secretary argues that the October ROCs comprise

"the *majority* of the infractions causing [Mr. Norman's] removal." (Doc. 30 at 7)
(emphasis added). Not so. Mr. Norman's supervisors filed three ROCs on October
16, 18, and 22, compared with the *five* ROCs on June 16 and 24 and July 12, 13,
and 14; Hendrix's firing decision purportedly relied on them all.

At any rate, the October 2017 ROCs support *Mr. Norman's case* at least as
much as they support the Secretary's. First, they begin two months after Mr.
Norman filed his EEO complaint—a temporal proximity that supports an inference
of a retaliatory causal link to Mr. Norman's protected conduct. *See Donnellon*, 794
F.2d at 601. They also occur in rapid succession on October 18, 19, and 22, despite
a lack of ROCs documenting any misconduct by Mr. Norman since mid-July or
prior to his harassment complaints. This timing raises concerns as to the validity of
the ROCs.

Further, genuine factual disputes exist as to the incidents underlying the
October 2017 ROCs. For example, the October 18 ROC by Fowlkes alleges that
Mr. Norman left several cases uncleaned before leaving his work station. (Doc. 22-
20). But Mr.  Norman responded that VA protocol required him to get Chief
Richardson's approval of his work station before he left; and he testified that she
approved him to leave that day after inspecting his work. (Doc. 22-5 at 32).
Fowlkes admitted that this inspection practice was typical, but he did not know
whether Richardson inspected Mr. Norman's work on that day. (Doc. 22-5 at 21).

The October 19 ROC concerns Mr. Norman allegedly leaving work early, leaving items uncleaned, and leaving biological results unrecorded. (Doc. 22-21). Mr. Norman responded that Fowlkes—who wrote the ROC—conducted a walk-through of Norman's station before approving him to leave for the day. (Doc. 22-1 at 18).

And the October 23 ROC concerned Mr. Norman's alleged failure to record temperatures for a week-long period. (Doc. 22-19). Mr. Norman responded that such responsibility belonged to the lead technician of the day shift, rather than to him, and that he observed the lead tech record the temperatures "on a daily basis." (Doc. 22-1 at 21). So Mr. Norman's testimony creates yet another "swearing match" as to whether the three ROCs that Fowlkes filed in October 2017 provide a legitimate basis for his firing. *See Feliciano*, 707 F.3d at 1253.

Mr. Norman's evidence also raises a reasonable concern as to whether Fowlkes—who wrote all the October 2017 ROCs—harbored retaliatory animus toward him. For example, Fowlkes received a written counseling as part of the department-wide discipline that resulted from Mr. Norman's complaints of sexual harassment in April and May of 2017. Fowlkes testified that he "disagreed with that write-up." (Doc. 22-5 at 11). A reasonable jury could infer that Fowlkes harbored retaliatory animus toward Mr. Norman after that event.

Fowlkes also admitted that he did not work day shifts with Mr. Norman on

most occasions after Mr. Norman's reassignment to the day shift on June 27;
rather, Chief Richardson was Mr. Norman's on-site supervisor at that time. (Doc.
22-5 at 11). Even so, Fowlkes and Reynolds filed ROCs against Mr. Norman in
July and October 2017, while Chief Richardson filed no ROCs or disciplinary
actions against Mr. Norman during that time.

In fact, Fowlkes's testimony makes clear that he lacked first-hand
knowledge as to at least some of the ROC incidents he reported. For one instance
that Mr. Norman allegedly failed to clean items, Fowlkes only suspected that
Norman was to blame because "the time that the [soiled] cart came down should
have been a time when [Mr. Norman] was present" in the sterilization center. (Doc.
22-5 at 7). And as for the lead tech's alleged failure to record temperatures,
Fowlkes testified that he did not know whether Mr. Norman or the other daytime
technician acted as "lead tech" at that time, and he admitted that he did not check
with Mr. Norman or with the day shift supervisor, Chief Richardson, before filing
the ROC against Norman. (Doc. 22-5 at 14). Yet, he filed no ROC against the other
alleged lead tech, who could have been at least equally, if not solely, to blame for
the failure to record temperatures. This evidence creates a reasonable doubt as to
whether Fowlkes filed the ROCs in October 2017 based on retaliatory animus,
rather than observance of actual misconduct.

The court recognizes that it has essentially analyzed whether the Secretary's

proposed justifications were pretextual. As explained above, the court finds that a reasonable jury could infer that the ROCs were retaliatory. But even if the court made no such finding, that would not foreclose Mr. Norman's claims because, under *Babb*'s causation standard, "the presence of [non-pretextual] reasons doesn't cancel out the presence, and the taint, of discriminatory considerations." *Babb*, 992 F.3d at 1204. So the pretext analysis above merely supports the court's conclusion that a genuine dispute exists as to whether Mr. Norman's termination was "free from" the taint of retaliation. *See Babb*, 992 F.3d at 1204; *see also Ford*, 2021 WL 6113657, at *8 (finding causation based on pretextual justifications). A jury could reasonably doubt the ROCs' validity and instead infer that retaliation tainted the decision of Mr. Norman's supervisors to fire him.

## IV.   <u>CONCLUSION</u>

The Secretary seeks summary judgment on the sole basis that Mr. Norman has failed to show a genuine issue as to whether retaliation caused his termination. For the reasons explained above, the court finds Mr. Norman presented sufficient evidence to raise a genuine dispute as to whether retaliation tainted the VA's decision to fire Mr. Norman. So the court will enter a contemporaneous order denying the Secretary's motion for summary judgment.

**DONE** and **ORDERED** this 28th day of July, 2022.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE